# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JAMES McROY, <br>     Plaintiff, <br><br> v. <br><br> MICHAEL SHEAHAN and <br> ARAMARK CORRECTIONAL <br> SERVICES, INC. <br>     Defendants. | Case No. 03 C 4718 <br> Magistrate Judge Geraldine Soat Brown |

## MEMORANDUM OPINION AND ORDER

Plaintiff James McRoy ("McRoy") brought this action pursuant to 42 U.S.C. § 1983, alleging that Sheriff Michael Sheahan ("Sheahan") and Aramark Correctional Services, Inc. ("Aramark") (collectively, "Defendants") violated his civil rights by providing him with uncooked chicken, spoiled lunch meat and spoiled milk (Count I). (Third Am. Compl. ¶¶ 10, 14, 20, 24, 28, 30, 34, 37.) [Dkt 42.] McRoy also alleges two state law claims against Aramark for physical harm caused by the consumption of a dangerous or contaminated food product (Count II) (*id*. ¶¶ 46-55), and breach of implied warranty (Count III) (*id*. ¶¶ 56-62).[1] Both Sheahan and Aramark have moved for summary judgment. [Dkt 62, 66.] The parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 16, 17, 18.] For the reasons set forth below, Sheahan's motion for summary judgment is granted and Aramark's motion for summary judgment on Count I of McRoy's Third Amended Complaint is granted. Count I is the sole claim arising under federal law, and the court declines to exercise supplemental jurisdiction over the remaining state law claims

---

[1] In its motion for summary judgment, Aramark incorrectly states that McRoy filed a single count complaint based on Eighth Amendment violations. (Aramark Mot. ¶ 1.)

1

against Aramark. 28 U.S.C. § 1367(c)(3). Accordingly, Counts II and III are dismissed without prejudice.

## FACTUAL BACKGROUND[2]

McRoy has been incarcerated at the Cook County Correctional Facility, Division 11, since December 2002. (Sheahan's LR Resp. ¶ 1.)[3] Division 11 [4] has four wings and houses between 1100 to 1500 detainees. (Pl.'s LR Resp. to Aramark ¶¶ 3, 5.)

Aramark is a food service contractor at the Cook County Jail. (Sheahan's LR Resp. ¶ 2.) Donna Whims is the dietician for Aramark. (Pl.'s LR Resp. to Aramark ¶¶ 5, 32.) Her responsibilities include training employees and overseeing quality control in terms of the overall sanitation practices and quality of the food. (*Id.* ¶ 32.)

---

[2] The following facts are taken from the parties' responses to the respective statements of fact filed pursuant to Local Rule 56.1, which are cited herein as: "Pl.'s LR Resp. to Sheahan ¶ ___" [dkt 84], "Pl.'s LR Resp. to Aramark ¶ ___" [dkt 85], "Sheahan's LR Resp. ¶ ___" [dkt 89], "Aramark's LR Resp. ¶ ___" [dkt 91], and from the exhibits submitted with those statements or responses to those statements, or legal memoranda, which are cited herein as: "Pl.'s LR Ex. ___" [dkt 75], "Sheahan's LR Ex. ___" [dkt 62] and "Aramark's LR Ex. ___" [dkt 66]. Statements not responded to or not controverted by specific references to the record are deemed admitted. L.R. 56.1(b)(3).

[3] In his Response, McRoy states that he is a pretrial detainee, without providing any factual citations to support his statement. (McRoy Resp. to Aramark at 1.) [Dkt 87.] Although the Eighth Amendment does not apply to pre-trial detainees, they are entitled to at least as much protection as the constitution provides convicted prisoners. *Board v. Farnham*, 394 F.3d 469, 477-78 (7th Cir. 2005). However, the Seventh Circuit has "found it convenient and entirely appropriate to apply the same standard to claims arising under the Fourteenth Amendment (detainees) and Eighth Amendment (convicted prisoners) 'without differentiation.'" *Id.* at 478, quoting *Henderson v. Sheahan*, 196 F.3d 839, 845 n.2 (7th Cir. 1999). Therefore, the Eighth Amendment standards will be applied to this case.

[4] Although Aramark's LR Statement referred to Division IX (rather than XI), this appears to be a typographical error. (Aramark's LR Stmt. ¶ 5 [dkt 66]; *see also* Sheahan's LR Ex. 1, Deposition of James McRoy at 14-15.)

**A.     Food Handling Procedures**

Aramark's factual statement describes certain food handling procedures it follows, which McRoy does not dispute. Aramark's employees establish the menu, order the food, handle the delivery and storage of the food, and prepare all of the meals for the Cook County Jail. (Pl.'s LR Resp. to Sheahan ¶ 23.) To maintain its food service license, Aramark complies with the "Illinois Public Health Guidelines"[5] and receives annual certification from the city and the county. (Pl.'s LR Resp. to Aramark ¶ 32.) Aramark also follows federal guidelines that govern the inspection of food from the time it is received until it is served to assure that it is safe for consumption (the Hazard Analysis and Critical Control Point ("HACCP") System, 9 C.F.R. §§ 417.1 - 417.8 (2006)). (Pl.'s LR Resp. to Aramark ¶ 32; Sheahan's LR Ex. 9, Deposition of Donna Whims at 11.) The HACCP inspection consists of checking food temperatures, tray accuracy, and sanitation in general. (Pl.'s LR Resp. to Aramark ¶ 33.) Whims checks the cooler temperature and looks for any damaged equipment to determine its overall functioning. (*Id.*)[6] Whims also checks for signs of infestation. (Whims Dep. at 12.) Whims performs the HACCP inspection monthly and the food service manager performs that inspection weekly. (Pl.'s LR Resp. to Aramark ¶ 32.)

In addition to the monthly and weekly inspections, at every meal, the temperature of the food is checked and recorded as it cooks to ensure that it reaches a safe temperature for consumption.

---

[5] Aramark does not explain what the Guidelines are or what they entail. McRoy, however, does not dispute that Aramark follows the Guidelines. Presumably, Aramark is referring to guidelines or rules promulgated by the Illinois Department of Public Health. *See e.g.*, 20 Ill. Comp. Stat. 2305/2 (2004).

[6] Because McRoy neither admitted nor disputed this fact, it will be deemed admitted. L.R. 56.1(b)(3).

(*Id*. ¶ 34.) A supervisor also tastes the food in the serving line and records its appearance, taste, and temperature. (*Id*.)

Aramark orders the food for the detainees and controls the receiving process and the storage process of the food. (Sheahan's LR Resp. ¶ 3.)[7] When the food arrives at the facility, the warehouse personnel unpack the food, identify it, inspect it for signs of damage or spoliation, and distribute it to the central kitchen or the Division 11 coolers. (Pl.'s LR Resp. to Aramark ¶ 36.) To ensure that the food will not spoil, Aramark's goal is to have the food in the coolers within one hour of receipt. (*Id*.) The food and beverages stored in the refrigerator are rotated, so that when the cooler is being stocked, the products that were already in the cooler are moved to the front, and the new products are put in the back. (Pl.'s LR Resp. to Sheahan ¶ 26; Whims Dep. at 64.) Aramark's staff also checks the packaging and expiration dates of the food and beverages served at the Cook County Jail. (Pl.'s LR Resp. to Sheahan ¶ 24.) Any food or beverage that is spoiled or past the expiration date is discarded. (*Id*. ¶ 25.)

Division 11 has two or three food storage facilities. (Pl.'s LR Resp. to Aramark ¶ 37.) McRoy admits that he does not know how many refrigerators are in Division 11. (*Id*. ¶ 8.) As a practice, Aramark checks the temperatures of the coolers every shift (every eight hours). (*Id*. ¶ 37.) In addition, Aramark's personnel are constantly in and out of the coolers and would detect a change in the temperature. (*Id*.) A safe refrigerator temperature is between 35 and 38 degrees. (*Id*.) When a cooler malfunctions, a mechanic is called to repair the refrigerator and the food is moved to another cooler or storage facility. (*Id*.)

---

[7] While Aramark denies that it "controls" the receiving process and the storage process of the food (Aramark's LR Resp. ¶ 3), Whims' deposition states that the purchasing manager works for Aramark and he orders the food, keeps track of the invoices and the receiving process and even keeps track of the storage process. (Whims Dep. at 16-17.)

4

Milk is delivered several times throughout the week. (*Id*. ¶ 49.) Milk and other products with expiration dates are checked in the warehouse before they are brought to the tray line. (*Id*. ¶ 34.) The milk is served in individual cartons with the expiration date stamped on the side. (*Id*. ¶ 18.) There is no way to determine whether milk is spoiled prior to serving it because Aramark relies on the expiration dates printed on the milk cartons. (*Id*. ¶ 44.) The only way of checking for spoiled milk is by verifying that the day the milk is being served is not beyond the expiration date stamped on the carton, as well as ensuring that the milk is stored at an appropriate temperature. (*Id*.)

Detainees receive three meals a day, which are served in the living area. (*Id*. ¶ 5.) All three meals are served on a tray that is prepared in the kitchen located on the premises of Division 11. (*Id*. ¶ 6.) After the food is prepared, it is brought from the kitchen to the living area by an elevator and the trays are distributed by the correctional officers with the assistance of some detainees. (*Id*.; Aramark's LR Resp. ¶ 4.) The deputy sheriff or officer on duty determines when the food is served. (Pl.'s LR Resp. to Aramark ¶ 7; Sheahan's LR Resp. ¶ 6.) No policies exist to govern how long the food can sit or when it must be delivered. (Whims Dep. at 68.) At his deposition, McRoy testified that sometimes the officer on duty does not serve the trays when they arrive in the living area. (McRoy Dep. at 78-80.) He explained that sometimes, when a detainee remains in his cell, he is not fed until lock-up time because the officers do not want to open the cells. (*Id*.) On these occasions, McRoy stated that even if the lunch trays arrive at 11:00 a.m., the detainees have to wait until the 1:30 p.m. lock-up to be served, or if the dinner trays arrived at 4:30 or 5:00 p.m., the detainees have to wait until the evening lock-up (sometimes as late as 9:30 p.m.). (*Id*.) McRoy also testified that he has seen the milk sitting out in the receiving area for periods of time, however, he did not specify any amount of time. (Sheahan's LR Resp. ¶ 26.)

### B. The Complaint Process

A detainee can file a grievance for complaints involving food service and food quality. (Pl.'s LR Resp. to Aramark ¶ 11.) Whims ultimately receives the inmate complaints for Aramark. (*Id.* ¶ 39.) Aramark investigates all written complaints and provides a written response. (*Id.*)

Outside of the grievance process, when a detainee complains about his food, an officer calls the food services department and requests a replacement. (*Id.* ¶ 41.) Aramark responds right away and replaces the product if a replacement is available. (*Id.* ¶¶ 41, 45.) When Aramark receives verbal complaints or if an officer orders a replacement meal, the complaint is not always documented. (*Id.* ¶ 48.) However, if the complaint is serious in nature, the officer fills out an "unusual occurrence report" and may return the product for investigation and replacement. (*Id.*) Whims does not recall ever receiving an unusual occurrence report for Division 11. (*Id.*)

Upon receiving a complaint, Whims conducts an investigation, which generally consists of contacting the food services manager to discuss the problem and learn the details about what occurred. (*Id.* ¶ 42.) She attempts to find out if the incident actually occurred and if the item or tray was returned. (*Id.*) She then determines whether further investigation or employee retraining is necessary. (*Id.*)

### C. Requests for Medical Attention

There are a number of ways an inmate can receive medical attention. First, a detainee can fill out a detainee health service request form. (Pl.'s LR Resp. to Aramark ¶¶ 9, 52.) The form is then given to an officer or nurse. (*Id.* ¶ 53.) The nurse performs an initial assessment of the patient to determine whether a physician visit is necessary. (*Id.* ¶¶ 52, 53.) Second, twice a day, a nurse visits the units and a detainee can request medical attention from the nurse. (*Id.* ¶ 9.) A detainee

can see a nurse without filling out a health service request form. (Sheahan's LR Resp. ¶ 30.) Nurses are allowed to give over-the-counter drugs to inmates without written requests for the drug. (*Id.* ¶ 31.) Third, if a detainee requires immediate medical attention, he can tell the officer on duty, who can try to get the detainee to the dispensary if necessary. (Pl.'s LR Resp. to Aramark ¶ 9; McRoy Dep. at 28.) Finally, when there is a true medical emergency, the detainee is taken directly to the emergency room. (Pl.'s LR Resp. to Aramark ¶ 52.) Dr. Enoch Anaglate is an on-staff physician with the Cermak Health Services ("Cermak") and was the primary physician assigned to Division 11 during the relevant time period. (*Id.*)

**D.     McRoy's Complaints**

McRoy admits that he does not like any of the food at the Cook County Jail. (Pl.'s LR Resp. to Sheahan ¶ 19.) McRoy alleges that he was actually served spoiled food on the occasions discussed below and that he became ill as a result. Both Aramark and Sheahan deny that any products served to McRoy were actually spoiled and that he became sick as a result.

McRoy's complaints fall primarily into three categories: uncooked chicken, spoiled milk, and spoiled lunch meat, with a few other miscellaneous complaints.

    1.     <u>Uncooked Chicken</u>

McRoy alleges that on March 11, 2003, he received a piece of chicken that was uncooked and bloody. (Pl.'s LR Resp. to Aramark ¶ 12.) In a grievance dated March 12, 2003, McRoy described the chicken as "burnt," but also stated that he ate a good portion of it even though it tasted like rubber and was bloody. (*Id.* ¶ 12.) McRoy informed the sergeant about the chicken and the sergeant called the kitchen for a replacement meal. (*Id.* ¶ 13; Sheahan's LR Resp. ¶ 10.) McRoy testified that after eating the chicken, he began vomiting and had diarrhea. (Pl.'s LR Resp. to

Aramark ¶ 14; McRoy Dep. at 43.)[8] The next day, McRoy went to the dispensary and received Maalox and Immodium AD. (Sheahan's LR Resp. ¶ 11; McRoy Dep. at 45-46.) Although McRoy testified that he was sick for "a good week afterwards," he did not fill out a detainee request for health services form. (Pl.'s LR Resp. to Aramark ¶ 14.) Also, even though McRoy received the "uncooked" chicken on March 11, 2003 (Tuesday), and filed a grievance the next day, on March 12, 2003 (Wednesday), the grievance states that he "was very uncomfortable [until] Friday . . . ." (*Id*.; Sheahan's LR Ex. 3.)

Whims acknowledged receipt of the March 12, 2003 grievance, and McRoy was provided a replacement meal. (Pl.'s LR Resp. to Aramark ¶¶ 15, 41.) The food service manager conducted an investigation, which concluded that although most of the chicken reached the standards for final cooking temperature, a few pieces of chicken were improperly positioned on the pan and did not reach the proper cooking temperature. (*Id*. ¶ 15.) As a result, the entire production staff was retrained on proper procedures for panning chicken in order to avoid a repeat occurrence. (*Id*.) Whims does not recall any other grievances filed about undercooked chicken. (*Id*. ¶ 40.)

---

[8] At his deposition, McRoy provided inconsistent statements about when he became ill. At one point, McRoy testified he became ill the next day, but later testified that he experienced the symptoms almost immediately that same evening. (Pl.'s LR Resp. to Aramark ¶ 14.)

2. Spoiled Lunch Meat

McRoy filed three grievances alleging that he received spoiled lunch meat.[9] However, there is no evidence that the lunch meat was served past its expiration date,[10] and when McRoy complained about the lunch meat, he received a replacement meal.[11] (Pl.'s LR Resp. To Aramark ¶¶ 22, 24.)

In the March 25, 2003 grievance, McRoy complained that his turkey sandwich smelled bad (sour) and tasted terrible. (*Id*. ¶ 16.) In the grievance, McRoy claimed that he was informed by other inmates that the meat was spoiled before he ate enough to get sick. (Sheahan's LR Ex. 3.) However, at his deposition, he testified that he suffered from an upset stomach and diarrhea after eating the sandwich. (Pl.'s LR Resp. to Aramark ¶ 16; McRoy Dep. at 52.) McRoy claims that he told an officer that he was sick and requested to see a doctor. (Pl.'s LR Stmt. ¶ 17.) However, McRoy did not fill out a request for medical attention and he did not see a doctor. (Pl.'s LR Resp. to Aramark ¶ 16.)

---

[9] The dates of the grievances are March 25, 2003, August 7, 2003 (for lunch meat served on July 24, 2003), and March 31, 2004. (Pl.'s LR Resp. to Aramark ¶¶ 16, 22, 24.)

[10] McRoy admits that the products served on July 24, 2003 and March 31, 2004 were served prior to the expiration date. (Pl.'s LR Resp. to Aramark ¶ 45.) There is no evidence about the expiration date of the March 25, 2003 lunch meat.

[11] On March 25, 2003, McRoy was not provided with a replacement meal because he was, in his words, "eating on the run." (Pl.'s LR Resp. to Aramark ¶ 16.) It is not entirely clear what McRoy means by "eating on the run," however it appears from the deposition testimony that McRoy left the unit and returned later. (McRoy Dep. at 52.) Aramark states that McRoy was not provided a replacement meal "because he did not report it," citing to McRoy dep. at 50-52, 97, Ex. 3. McRoy denies that he did not ask for a replacement sandwich, citing to McRoy dep. at 52, lines 12-18. McRoy's deposition provides contradictory testimony regarding whether he actually requested a replacement sandwich. At one point in his deposition, McRoy testified that he asked for a replacement sandwich, but was not provided one. (McRoy Dep. at 52.) However, later in his testimony, while reading from a deposition exhibit, McRoy testified that he "could not report it because of moving." (*Id*. at 97.)

Aramark responded to the March 25, 2003 grievance, stating that "[s]ome of the luncheon meats may have a strong aroma due to the spices used in processing such as garlic. This does not mean the meat is spoiled and unfit to eat . . . . No staff member has reported spoiled or unfit products." (Sheahan's LR Ex. 6; Pl.'s LR Resp. to Aramark ¶ 17.) Whims does not recall any other grievances being filed complaining of spoiled lunch meat. (Pl.'s LR Resp. to Aramark ¶ 43.)

McRoy speculates that the lunch meat was spoiled on March 25, 2003 because one of the coolers in Division 11 was not functioning properly and registered a temperature of 53 degrees, even though a safe refrigeration temperature is between 35 and 38 degrees. (*See* McRoy Resp. to Aramark at 7; Aramark's LR Resp. ¶ 18.) There is no evidence that McRoy's grievance and the malfunctioning refrigerator were related or that the lunch meat McRoy received came from the malfunctioning refrigerator. (Pl.'s LR Resp. to Aramark ¶ 50.)

3.   Spoiled Milk

McRoy filed a number of grievances[12] complaining that the milk he received was spoiled.[13] However, McRoy admits that the milk cartons were all served prior to the expiration date printed on the carton.[14] Also, when McRoy complained that the milk was spoiled he received a replacement

---

[12] Although Sheahan states that several of the grievances were not properly filed with program services (*see* Sheahan's LR Resp. ¶¶ 23, 25), Sheahan provides no citation to support his statement regarding proper filing procedures and thus the fact that at least some of the grievances were filed is deemed admitted. L.R. 56.1(b)(3).

[13] The dates of these grievances identified by McRoy are April 28, 2003, July 1, 2003 (for milk served on June 30, 2003), July 17, 2003 (for milk served on July 15, 2003), January 23, 2004, and July 25, 2004. (Pl.'s LR Resp. to Aramark ¶¶ 18, 20, 23, 25; Pl.'s LR Stmt. ¶¶ 23, 25; McRoy Dep., Ex. 15.)

[14] For example, the milk served on April 28, 2003 was dated April 30, 2003. (Pl.'s LR Resp. to Aramark ¶ 18.) The milk served on June 30, 2003 was dated July 2, 2003. (*Id.* ¶ 20.) McRoy admits that the milk served on January 23, 2004 and July 25, 2004 were served prior to the expiration date. (*Id.* ¶ 45; McRoy Dep., Ex. 13.)

10

drink if one was available.[15] McRoy claims that he experienced various symptoms when he drank the "spoiled" milk, including an upset stomach, diarrhea, boils, and headaches. (Pl.'s LR Resp. to Aramark ¶¶ 18, 20.)

4. Other Complaints

On August 7, 2003, McRoy filed a grievance because he believed that on July 18, 2003, a rat ate through his lunch bag. (*Id.* ¶¶ 21, 22.) He reported it to the officer on duty and the meal was replaced. (*Id.*)

On July 25, 2004, McRoy complained that he was not receiving diet trays. (*Id.* ¶ 25.) Aramark responded by confirming that McRoy's name appeared on the diet roster. (*Id.*)

E. **McRoy's Claimed Injuries**

McRoy claims that the injuries he sustained from consuming spoiled meat, undercooked chicken, and spoiled milk include blood in his stool, hemorrhoids, upset stomach, diarrhea, vomiting, urine problems, boils, swollen hands and feet, headaches, inability to eat, and stress. (Pl.'s LR Resp. to Aramark ¶ 30.) He concedes that he also claimed these same ailments in another lawsuit filed against the County. (*Id.*) McRoy admits that in this lawsuit he attributes all of his medical problems to the food and milk he consumed. (*Id.* ¶ 31.) McRoy was never diagnosed with food poisoning, nor did he request testing to determine whether he had food poisoning. (Pl.'s LR Resp. to Sheahan ¶ 17.)

---

[15] He received a replacement on April 28, 2003 and June 30, 2003. (Pl.'s LR Resp. to Aramark ¶ 18; McRoy Dep., Ex. 15.) However, on January 23, 2004, McRoy was not given a replacement because there was no more milk available. (Pl.'s LR Resp. to Aramark ¶ 23.)

11

Dr. Anaglate is familiar with the symptoms of food poisoning and ingesting spoiled meat, undercooked chicken, and spoiled milk. (Pl.'s LR Resp. to Aramark ¶ 54.) The symptoms include a general sick feeling with abdominal pain, diarrhea, abdominal distention, gas, and vomiting. (*Id*.) The severity of the symptoms varies depending on the type of product consumed and the onset of symptoms varies from immediately to within a few hours. (*Id.*; Dr. Anaglate Dep. at 19.) Food poisoning does not cause hemorrhoids, boils, difficulty urinating, or stress. (Pl.'s LR Resp. to Sheahan ¶ 21; Dr. Anaglate Dep. at 43-45.)[16] In order to confirm a diagnosis of food poisoning, the food must be tested. (Pl.'s LR Resp. to Aramark ¶ 56.) Dr. Anaglate does not recall ordering that any food be tested to confirm a diagnosis of food poisoning during the relevant time period. (*Id*.)

Dr. Anaglate reviewed McRoy's medical records and was unable to find a health service request form with complaints of abdominal pain, cramping, diarrhea, or other symptoms that would be attributable to food poisoning. (*Id*. ¶ 57.) McRoy admits that he sought medical attention for left shoulder pain, his knee, swelling in his hand and feet, and tuberculosis. (*Id*. ¶ 27.) He also admits that during his visits to Cermak, he never reported any episodes of diarrhea, vomiting, abdominal discomfort, or other symptoms consistent with food poisoning. (*Id*. ¶ 58.) Furthermore, during the relevant time period, McRoy was taking several medications, including Salsalates and Motrin, which can cause an upset stomach, blood in his stool, gastritis and the swelling of the hands and feet. (*Id*. ¶ 59.) Diarrhea is also a non-specific side effect of many medications. (*Id*.)

Because the symptoms of food poisoning are generally vague, Dr. Anaglate includes food poisoning in his differential diagnosis only when he sees a number of patients with similar

---

[16] Although Sheahan's LR Stmt. states that food poisoning does not cause swollen feet and hands or headaches, the citation to the record does not support that assertion. (Sheahan's LR Stmt. ¶ 21.)

complaints of nausea, vomiting, abdominal pain, and diarrhea. (*Id.* ¶ 55.) From February 2003 to November 2004, Dr. Anaglate does not recall multiple patients with similar complaints in Division 11. (*Id.*) There were no episodes of food poisoning in Division 11 during the relevant time period. (*Id.*)[17] Likewise, Whims is not aware of any medically reported incidents of food poisoning from January 2003 to November 2004. (*Id.* ¶ 38.)

## LEGAL STANDARD

The court may properly grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Id.* at 255. The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met the initial burden, the non-moving party must designate specific facts showing that there is a genuine

---

[17] Although McRoy denies that there were no instances of food poisoning in Division 11 during the relevant time period, the citation provided in his response does not support his denial. (Pl.'s LR Resp. to Sheahan ¶ 18.) McRoy cites pages 6-7 of his deposition, but presumably means pages 46-47, in which he testifies that on March 11, 2003, he saw "several other people coming in complaining because of the chicken of the night before also." However, that hearsay statement is not admissible evidence that those people suffered food poisoning. Thus, Sheahan's statement will be deemed admitted. L.R. 56.1(b)(3).

issue for trial. *Id.* at 324. The non-moving party must support its contentions with admissible evidence and may not rest upon the mere allegations in the pleadings or conclusory statements in affidavits. *Id*. *See also Winskunas v. Birnbaum*, 23 F.3d 1264, 1267 (7th Cir. 1994) (non-moving party is required to present evidence of "evidentiary quality" (*i.e.*, admissible documents or attested testimony, such as that found in depositions or in affidavits) demonstrating the existence of a genuine issue of material fact). "[N]either 'the mere existence of some alleged factual dispute between the parties' . . . nor the existence of 'some metaphysical doubt as to the material facts,' . . . is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (quoting *Anderson*, 477 U.S. at 247 and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986)). Thus, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

**I.     McRoy's § 1983 Claims**

McRoy alleges that certain conditions of his confinement, specifically that he was served spoiled food and milk, constitute cruel and unusual punishment in violation of the Eighth Amendment. (McRoy Resp. to Aramark at 2; *see also supra* n. 3.) The treatment a prisoner receives in prison and the conditions of confinement are subject to scrutiny under the Eighth Amendment's proscription against cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). The Eighth Amendment is violated when there is a denial of basic human needs, such as food, shelter, clothing, medical care, and reasonable safety. *Helling*, 509 U.S. at 32. It is cruel

14

and unusual punishment to hold prisoners in unsafe conditions. *Id*. at 33 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982)). An inmate is entitled to a healthy, habitable environment that includes "providing nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *French v. Owens*, 777 F.2d 1250, 1255 (7th Cir. 1985). However, "[i]nmates cannot expect the amenities, conveniences and services of a good hotel . . . ." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988).

To establish an Eighth Amendment claim, McRoy must show: (1) that the deprivation of humane conditions of confinement was "objectively, sufficiently serious" enough to pose a substantial risk of serious harm; and (2) that the prison officials acted with "deliberate indifference" (*i.e.*, jail officials knew of and disregarded the prisoner's needs). *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). A showing of negligence is insufficient for liability; rather an "official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 835, 837.

### A. Objective element

To satisfy the objective component, a prisoner must demonstrate that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citation omitted). Both Sheahan and Aramark argue that McRoy has failed to provide evidence that the food he was served was spoiled or that he actually became ill as a result of consuming that food, and, accordingly, has failed to demonstrate that his conditions of confinement exposed him to serious harm. (Sheahan's Mem. at 3-4; Aramark's Mem. at 4-6.)

15

Except for the one instance of improperly cooked chicken, which was investigated and corrected, McRoy has not provided any evidence other than his own grievances and testimony to support his claim that the food and milk he consumed was in any way unwholesome or that any illness resulted.

McRoy also has not presented any evidence of unsanitary or unsafe kitchen condition or food handling procedures, other than the single instance of improperly cooked chicken. Rather, it is undisputed that the milk and lunch meat at issue were served prior to the expiration date stamped on the package. *See Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001) (stating that "[t]he Eighth Amendment does not require prisons to provide prisoners with more salubrious air, healthier food, or cleaner water than are enjoyed by substantial numbers of free Americans").

Likewise, McRoy has presented no evidence establishing that the food and beverages he ingested caused him any injury. Although McRoy asserts that he suffered from food poisoning, resulting in symptoms of upset stomach, blood in his stool, diarrhea, hemorrhoids, vomiting, urine problems, boils, swollen hands and feet, headaches, inability to eat, and stress, there is no evidence to support his claim that his symptoms were caused by the food and beverages he was served. He provided no evidence that he ever sought medical attention for symptoms of upset stomach or diarrhea except his own testimony about one trip to the dispensary for over-the-counter medications and one complaint to an officer. Although McRoy requested medical service related to problems with his left shoulder, knee, hand, feet, and tuberculosis, there is no evidence that he ever filled out a request for health services form for complaints relating to an upset stomach or diarrhea, and he admits that he did not seek any medical attention from Cermak for complaints relating to upset stomach or diarrhea. Dr. Anaglate confirmed that McRoy never reported to him any episodes of diarrhea, vomiting, abdominal discomfort, or other symptoms attributable to food poisoning.

16

Consequently, no test was ever performed to determine whether McRoy had food poisoning, and he was never diagnosed with food poisoning. Also, McRoy was taking several medications, including Salsalates and Motrin, which can cause upset stomach, blood in the stool, gastritis and swelling of the hands and feet. The absence of any evidence that McRoy sought medical attention for symptoms caused by spoiled food confirms that the conditions of McRoy's confinement were not sufficiently serious to be a constitutional violation.

A plaintiff must provide some evidence by which a reasonable jury could find that the consumption of the prison food caused serious injury. McRoy relies on *Pritchett v. Page*, No. 99 C 8174, 2002 WL 1838150 (N.D. Ill. Aug. 12, 2002) (Nordberg, J.), to argue that a plaintiff who alleges that he became physically ill after consuming prison meals has a claim that is sufficiently serious to raise a triable issue of fact regarding the nutritional adequacy of meals served. (McRoy Resp. to Aramark at 4.) However, in *Pritchett*, there was evidence (beyond the plaintiff's subjective complaints) that "he lost a significant amount of weight [twelve pounds] while incarcerated at Stateville." 2002 WL 1838150 at *6. McRoy, on the other hand, has not presented any evidence that would give rise to a triable issue of fact. *See McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.")

Based on all of the above, McRoy had failed to satisfy the objective standard established in *Farmer* because he has failed to present evidence by which a reasonable jury could find that the conditions of his confinement posed a substantial risk of harm that was objectively, sufficiently serious.

### B. Subjective Element

17

In addition, McRoy has failed to produce evidence of deliberate indifference. To satisfy the subjective component of an Eighth Amendment violation, a prisoner must demonstrate that prison officials acted with a sufficiently culpable state of mind, which is "deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation omitted). Deliberate indifference requires that the official "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. An officer's actual knowledge of impending harm can be inferred from circumstantial evidence. *Id*. at 842. However, a prison official who actually knew of a substantial risk to a detainee's health or safety is "free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that [he was] deliberately indifferent." *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) (citing *Farmer*, 511 U.S. at 844-45). *See also Jolley v. Aramark Correctional Services, Inc.*, No. 03 C 6782, 2005 US Dist. LEXIS 14255 at *10-11 (N.D. Ill. July 18, 2005) (St. Eve, J.) (finding no deliberate indifference where an inmate complained of several instances of spoiled milk because an investigation was conducted, the milk was replaced, and the defendant had policies to rotate food and beverage and discard expired products).

In this case, it is undisputed that Aramark follows state and federal guidelines for food safety and had food handling procedures in place to ensure the safety of the food and beverages served. Aramark also took appropriate steps and responded reasonably to McRoy's complaints. When McRoy complained about his food or beverage, it was replaced if a replacement was available. Also, when McRoy complained about the uncooked chicken, Aramark conducted an investigation that resulted in the retraining of the entire production staff in order to avoid a repeat occurrence. The undisputed evidence shows that Aramark also has procedures in place to avoid serving spoiled

18

food, including relying on the expiration date printed on the product and rotating the products in the refrigerator.

C.  **Government Custom or Practice**

To sustain his claim against Sheahan based on a theory of municipal liability under *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 694 (1978), McRoy must show that Sheahan, acting in his official capacity, had a policy or custom that caused the injury of which McRoy complains. McRoy has not demonstrated that Sheahan's contracting with Aramark to provide food services at the Cook County Jail results in any constitutional violation. McRoy also argues that allowing the officer on duty to determine when the inmates eat causes food to sit for hours at a time. (McRoy Resp. to Sheahan at 6-7.) Again, McRoy has not shown that the practice caused any food or milk to spoil, or that he incurred any injury as a result. Because McRoy has failed to present evidence of a constitutional violation, summary judgment is also entered in favor of Sheahan.

II.  **Prison Litigation Reform Act**

Sheahan has requested that the court charge McRoy with a strike pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915(g). (Sheahan Mem. at 9.) The PLRA prohibits a prisoner from filing a lawsuit *in forma pauperis* if the prisoner has on three or more occasions brought an action or appeal that was dismissed on the grounds that it was frivolous, malicious, or failed to stated a claim upon which relief may be granted. *U.S. v. Antonelli*, 371 F.3d 360, 361 (7th Cir. 2004). However, Sheahan has provided no argument regarding that request. Due to Sheahan's failure to develop his argument regarding this issue, a strike will not be assigned.

## CONCLUSION

For the reasons discussed above, Sheahan's and Aramark's Motions for Summary Judgment are granted. Judgment is entered in favor of both Defendants on Count I of McRoy's Amended Complaint. The court declines to retain supplemental jurisdiction over the remaining state law claims against Aramark, and Counts II and III are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

IT IS SO ORDERED.

_____
Geraldine Soat Brown
United States Magistrate Judge

September 22, 2006